748 F.2d 982
 40 UCC Rep.Serv. 215
 STARCRAFT COMPANY, A DIVISION OF BANGOR PUNTA OPERATIONS,
INC., Plaintiff and Third Party Plaintiff-Appellee,
v.
C.J. HECK COMPANY OF TEXAS, INC., Robert A. Johnson and
Carol H. Johnson, Defendants-Appellees,
v.
TEMPLE NATIONAL BANK, Third Party Defendant-Appellant.
 No. 83-1712.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 17, 1984.
 
 Beard & Kultgen, Pat Beard, David B. Kultgen, Waco, Tex., for third-party defendant-appellant.
 Clark, Thomas, Winters & Shapiro, Barry Bishop, Michael R. Klatt, Austin, Tex., for Starcraft Co.
 Fletcher F. Rhodes, Temple, Tex., for C.J. Heck, Johnson and Johnson.
 Appeal from the United States District Court for the Western District of Texas.
 Before TIMBERS,* POLITZ and RANDALL, Circuit Judges.
 RANDALL, Circuit Judge:
 
 
 1
 In this diversity action, we are called upon to decide whether a drawee bank who has missed the midnight deadline, and is therefore accountable to the payee for the amount of the item under Tex.Bus. & Com.Code Ann. [U.C.C.] Sec. 4.302(1), is liable to the payee when (1) the drawee bank, as a result of an unappealed judgment, has a right of charge back against the maker; and (2) the maker had previously discharged the underlying debt. We hold as a matter of Texas law that the drawee bank, although absolutely liable under Sec. 4.302(1), is equitably subrogated to the maker's right to restitution against the payee for double recovery on a single debt and that the resulting circularity of obligations has the effect of extinguishing the payee's statutory claim against the drawee bank. We, therefore, reverse the judgment of the trial court and remand with instructions that judgment be entered for the drawee bank.I. Factual and Procedural Background.
 
 
 2
 Appellees Robert A. Johnson and Carol B. Johnson (the Johnsons) were officers and the sole shareholders of C.J. Heck Company of Texas, Inc. (Heck). Heck was a distributor of recreational vehicles manufactured by appellee Starcraft Company (Starcraft). On or about April 28, 1978, Heck delivered to Starcraft a check, drawn on Heck's account at appellant Temple National Bank (the Bank), to be applied against Heck's open merchandise account with Starcraft. Starcraft deposited the check for collection. It was received for payment by the Bank on May 8, 1978. As a result of disagreements between Heck and Starcraft and at the request of Heck, the Bank stopped payment on the check on May 10, 1978. The Bank, however, failed to return the check to Starcraft by the "midnight deadline," as required by the Texas version of Uniform Commercial Code Sec. 4-302(1), which makes a bank accountable to the payee for the amount of a demand item not acted upon in a timely manner.
 
 
 3
 On January 31, 1979, Starcraft commenced the instant action in the District Court for the Western District of Texas. Shortly before the trial began on March 23, 1982, the pleadings had emerged so that the following claims were asserted. Starcraft asserted claims, first, against Heck on the debt owed for goods furnished; second, against the Johnsons on a guaranty of Heck's debts; and, third, against the Bank for failure to return to Starcraft the unpaid Heck check by the midnight deadline. The Bank asserted a claim against Heck and the Johnsons for any amount which the Bank might be required to pay Starcraft. Heck and the Johnsons asserted a claim against Starcraft, alleging various wrongs, including breach of warranty, usurious interest, wrongful termination of dealership, and slander. Before the trial began, Starcraft, Heck, and the Johnsons entered into a Stipulation of Partial Dismissal (hereinafter, the "Mutual Release"), pursuant to which these parties mutually released one another of all claims. The Mutual Release acknowledged that the Bank was not a party thereto and that the Mutual Release would not affect any claim asserted by or against the Bank.[1]
 
 
 4
 Before the trial began, the court instructed the Bank that it was not to present evidence regarding the values given and received by the parties to the Mutual Release.[2] The court refused to submit to the jury special interrogatories[3] regarding the Mutual Release as requested by the Bank.
 
 
 5
 Also before trial, the parties stipulated that in 1975 the Johnsons had executed and delivered to the Bank a guaranty agreement pursuant to which the Johnsons guaranteed all of Heck's debts to the Bank. In 1979, the Bank returned to the Johnsons the guaranty agreement, evidently operating under the assumption that all debts of Heck to the Bank had been paid. This redelivery took place after payment had been stopped on the Starcraft check on May 10, 1978.
 
 
 6
 In response to a special interrogatory, the jury found that the Bank did not return the check before the midnight deadline. On September 15, 1983, the court entered judgment in favor of Starcraft on its claim against the Bank in the amount of $158,392.15, plus interest, and in favor of the Bank against its customer Heck as a right of charge back in the same amount. The court denied recovery to the Bank on its claim against the Johnsons, stating that the Bank "presented no material evidence and did not request submission of any issues as to relief against [the Johnsons]." The Bank appeals from those portions of the judgment stated above. Heck, presently insolvent although apparently not a party to a bankruptcy proceeding, is not a party to this appeal.
 
 
 7
 II. Accountability under the Statute.
 
 
 8
 The Bank contends on appeal that, while Tex.Bus. & Com.Code Ann. Sec. 4.302 imposes a direct obligation on the Bank for missing the statutory midnight deadline, that obligation was discharged by Starcraft's acceptance of the Mutual Release. Section 4.302(1) states:
 
 
 9
 In the absence of a valid defense such as breach of a presentment warranty (Subsection (a) of Section 4.207), settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of
 
 
 10
 (1) a demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline.[4]
 
 
 11
 This section serves several purposes. First, the provision ensures that the payor or drawee bank will not deliberately act to protect the maker's credit rating to the detriment of the payee. Pecos County State Bank v. El Paso Livestock Auction Co., 586 S.W.2d 183, 186 (Tex.Civ.App.1979, writ ref'd n.r.e.); see also Western Air & Refrigeration, Inc. v. Metro Bank, 599 F.2d 83, 90 n. 8 (5th Cir.1979). Second, the section speeds up the collection of checks through the banking system. Id.; see also Chrysler Credit Corp. v. First National Bank & Trust Co., 582 F.Supp. 1436, 1438 (W.D.Penn.1984). Third, the provision, as part of a strict set of rules relied upon by depositary banks to know when a check has been accepted or dishonored, injects certainty into the check collection process. Bank Leumi Trust Co. v. Bank of Mid-Jersey, 499 F.Supp. 1022, 1026 (D.N.J.1980), aff'd, 659 F.2d 1065 (3d Cir.1981). To effectuate these policies, the Texas courts, along with the majority of jurisdictions across the country, have construed Sec. 4.302 as a strict liability provision. Pecos County State Bank, supra, at 186; Continental National Bank v. Sanders, 581 S.W.2d 293, 295 (Tex.Civ.App.1979, no writ); New Ulm State Bank v. Brown, 558 S.W.2d 20, 25 (Tex.Civ.App.1979, no writ); see generally Annot., 22 A.L.R.4th 10 (1983). In New Ulm State Bank, the Texas court further held that the drawee bank's accountability under the section does not depend upon a showing that the underlying instrument is enforceable:
 
 
 12
 [The bank's] liability for the late return of an item resulted from the responsibilities imposed upon it under the statute, and a recovery based upon its failure to perform its statutory duty was not dependent upon a showing that the instrument was enforceable against it. 2 Bender, Uniform Commercial Code Service, 7-31, Sec. 7.15(2).
 
 
 13
 New Ulm State Bank, supra, at 25; see also Northwestern National Insurance Co. v. Midland National Bank, 96 Wis.2d 155, 165, 292 N.W.2d 591, 597 (1980) (liability under the section "is not premised on the instrument itself").
 
 
 14
 Notwithstanding the above stated principles, however, it is clear that the drawee bank's liability must have some connection with the underlying debt. Section 4.302 does not impose, for example, a fine on the drawee bank for violating the statute. Rather, for failing to act before the midnight deadline, the drawee bank is required to pay the debt evidenced by the check. Indeed, only because the bank is held liable for the actual debt is the bank justly entitled to recover the funds from the original maker. If the bank's payment of the face amount of the check were merely to constitute satisfaction of a fine, the payee would be able to recover an identical amount from the maker. This result surely was not intended by the drafters of the U.C.C. or the Texas legislature when it enacted the statute.
 
 
 15
 The language of Sec. 4.302 supports this interpretation. Section 4.302 states that the bank will be held "accountable" for the amount of the demand item if the bank misses its midnight deadline. While the Texas courts in other factual contexts have interpreted the statutory term "accountable" to mean merely "liable," the phrase in this context has additional connotations. "Accountable" implies a preexisting object. A person who is accountable is answerable for property (including a debt) that predates the accounting. While a person can be liable for a fine, he can be accountable only for property. See Met Frozen Food Corp. v. National Bank, 89 Misc.2d 1033, 393 N.Y.S.2d 643 (1977) ("A person accounts for property that is not his own."). Thus, because under Sec. 4.302 the Bank is strictly "accountable" for the amount of the check as a result of missing the midnight deadline, the effect of payment by the Bank would be to honor a check drawn by Heck to satisfy a debt that has already been released.
 
 
 16
 This characterization of the obligation imposed by Sec. 4.302 is also consistent with Texas cases such as New Ulm State Bank, supra. As noted above, the court in that case held that, to maintain an action under Sec. 4.302 against a drawee bank, a payee did not have to show that the underlying instrument was enforceable. Id. at 25; see also Templeton v. First National Bank, 47 Ill.App.3d 443, 5 Ill.Dec. 720, 724, 362 N.E.2d 33, 37 (1977) (ruling that the maker's counterclaims against the plaintiff were "totally irrelevant to plaintiff's action against the bank"). This holding, however, indicates only that the bank's liability derives from the violation of the statute and not from the debt or duties of the debtor. The court in New Ulm State Bank did not regard the nature of the liability imposed by the section as that of a fine. While a bank that misses the midnight deadline is, under the statute, primarily and not secondarily accountable, that accountability is for the item itself. Thus, by satisfying its statutorily imposed liability, the bank would discharge the debt represented by the check.[5]
 
 
 17
 III. The Equitable Rights of the Maker.
 
 
 18
 As noted above, Heck's indebtedness to Starcraft has already been released. Because Heck, pursuant to the unappealed judgment of the district court, is liable to the Bank for its payment of the check's amount to Starcraft, Heck is effectively being required to discharge its debt twice,[6] with the Bank itself, at least theoretically, not having to suffer a loss. Heck, therefore, should have a counterclaim against Starcraft for the amount of the check based upon firmly established principles of restitution.[7] Indeed, as Professor Palmer has stated, restitution "usually is granted almost as a matter of course" when a debt is satisfied a second time. III G. Palmer, Law of Restitution Sec. 14.8, at 174 (1978). Although the second payment to the creditor usually results from mistake of law or fact, the essential question is whether there is "the unjust retention of benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. A right of recovery under unjust enrichment is essentially equitable and does not depend upon the existence of a wrong." Fun Time Centers, Inc. v. Continental National Bank, 517 S.W.2d 877, 884 (Tex.Civ.App.1974, writ ref'd n.r.e.). Lack of mistake should not preclude recovery by Heck since Starcraft, after receiving consideration for the release, was in no way entitled to recover a second time for the same debt.[8] Heck's payment to Starcraft by way of the Bank as middleman would clearly result in Starcraft's unjust enrichment.
 
 
 19
 The Texas Supreme Court has recently had opportunity to consider whether a claim for restitution would still be cognizable under state law. The court concluded that "a common law right to restitution still exists." Bryan v. Citizens Bank, 628 S.W.2d 761, 769 (Tex.1982). In Bryan, the maker of a check ordered the bank to stop payment on a check given to the payee. The bank nonetheless honored the check and paid the payee its face value. The bank then brought suit against the payee for restitution. The Supreme Court of Texas held that Tex.Bus. & Com.Code Ann. [U.C.C.] Sec. 4.407, which allows the bank to be subrogated to the rights of the payee against the maker in such a situation,[9] does not supplant the common law right to restitution under Sec. 1.103.[10] The court, however, held further that the purpose of restitution "is to prevent unconscionable loss to the party paying out the funds and unjust enrichment to the party receiving the payment." Because the bank had failed to show that it was precluded from recovering the funds through use of the Sec. 4.407 remedy, unconscionable loss had not been demonstrated. The bank, therefore, was not entitled to restitution.
 
 
 20
 In the instant case, as a result of the Bank's accountability under Sec. 4.302 and the unappealed judgment against Heck for charge back, Heck will bear ultimate responsibility for the payments to Starcraft, which will enjoy payment for a debt already discharged. The Texas version of the Uniform Commercial Code, unlike in Bryan, provides Heck with no remedy with which to avoid its potential loss. Thus, under the principle of restitution announced in Bryan, Heck is entitled to restitution for its "unconscionable loss" and Starcraft's unjust enrichment. See also Capital National Bank v. Wooten, 369 S.W.2d 475, 477 (Tex.Civ.App.1963, writ dism'd) ("Restitution should be made unless some inexorable rule of law intervenes.").
 
 
 21
 IV. Circularity of Obligations.
 
 
 22
 Thus, Starcraft is entitled to recover the amount of the check from the Bank who is entitled to the same amount from Heck. Heck in turn is entitled to reclaim its payment from Starcraft based upon principles of restitution. Texas courts have characterized such a series of claims as a "useless circuity of action." Phillips Pipe Line Co. v. McKown, 580 S.W.2d 435, 440 (Tex.Civ.App.1979, writ ref'd n.r.e.); Panhandle Gravel Co. v. Wilson, 248 S.W.2d 779, 785 (Tex.Civ.App.1952, no writ). In these cases, the Texas courts have held that, when a circular pattern of indemnity develops, the plaintiff's cause of action is extinguished. Phillips Pipe Line Co., supra, at 443; Panhandle Gravel Co., supra, at 784-85. See also Moore v. Southwestern Elec. Power, 737 F.2d 496, 501 (5th Cir.1984) (finding plaintiff's action extinguished under Texas law as a result of a circular pattern of indemnity). Because Starcraft's claim against the Bank likewise triggers a "circuity of action," we hold that Starcraft's claim is deemed extinguished.
 
 
 23
 V. Equitable Subrogation.
 
 
 24
 Heck, probably because its insolvency renders the issue academic, at least as to itself, did not assert its equities or the defense of circuity of action in district court and is presently not a party to this appeal. Starcraft argues that, since the Bank has no claim for restitution and is not a party to the Mutual Release, the Bank is not entitled to assert discharge of the debt as a defense to liability under Sec. 4.302. As noted above, Sec. 4.302 is a strict liability provision under which the drawee bank is accountable for the item regardless of the item's enforceability. Under these principles, therefore, the Bank is certainly not entitled to assert the defense of circuity of action in its own right. The Bank, however, claims that, under the particular and in some ways peculiar factual circumstances presented here, it is entitled to rely on Heck's equities and defenses.[11] Applying Texas principles of equitable subrogation, we find for the reasons set forth below that the Bank in this case is entitled to assert Heck's equities and defenses to extinguish Starcraft's claim.[12]
 
 
 25
 Equitable subrogation is "the substitution of one person in the place of another ... so that he who is substituted succeeds to the rights of the other in relation to the debt or claim." 53 Tex.Jur.2d Subrogation Sec. 1. Subrogation, an equitable remedy, can be characterized as "the purest of equities." Yonack v. Interstate Sec. Co., 217 F.2d 649, 651 (5th Cir.1955). In Yonack, we observed that "[t]he courts of Texas have been peculiarly hospitable to the right of subrogation and have been in the forefront in upholding the right to it." Id. See generally McBroome-Bennett Plumbing, Inc. v. Villa France, Inc., 515 S.W.2d 32, 36 (Tex.Civ.App.1974, writ ref'd n.r.e.).
 
 
 26
 In determining the applicability of the doctrine of subrogation, Texas courts have stated: "Equitable subrogation may be invoked to prevent unjust enrichment when one person confers upon another a benefit that is not required by legal duty or contract. A right to subrogation is often asserted by one who pays a debt owed by another." Smart v. Tower Land & Inv. Co., 597 S.W.2d 333, 337 (Tex.1980). Concededly, the Bank has a legal duty to pay Starcraft the amount of Heck's check. In this case, however, the mere existence of a legal duty does not by itself prevent Starcraft from being unjustly enriched, because, as discussed earlier, the purpose of the duty is not the payment of the debt but the primary accountability of the bank in order to ensure the quick process of checks through the system. Indeed, the fact that a bank under Sec. 4.302 may not even assert in its own defense the unenforceability of the item is evidence that the actual payment of the debt is almost a collateral consequence of the accounting. Moreover, the mere existence of a legal duty cannot be regarded as a per se bar against the recovery of restitution in light of the Texas courts' pronouncement that equitable subrogation is not to be applied according to rigid rules of application but that, "where purely equitable subrogation is an issue, each case must be controlled by its own facts." Reliable Life Ins. Co. v. Brown & Root, Inc., 607 S.W.2d 621, 630-31 (Tex.Civ.App.1980, writ ref'd n.r.e.); see also McBroome-Bennett Plumbing, Inc., supra, at 36 ("doctrine of subrogation is always given a liberal interpretation and is broad enough to include every instance in which one person ... has paid a debt for which another was primarily liable and which in equity and good conscience should have been discharged by the latter").
 
 
 27
 By paying the amount of the check, the Bank would unjustly enrich Starcraft for a debt that has already been discharged. Further, since the Bank is entitled to recover back from Heck the amount for which the Bank is liable to Starcraft, and since the insolvency of Heck has resulted in its failure to defend itself against its own liability, additional equities favor permitting the Bank to stand in the shoes of Heck and assert Heck's defense to extinguish Starcraft's claim. We therefore hold that the Bank is equitably subrogated to Heck's equities and defenses, thus making the action circuitous and extinguishing Starcraft's claim.[13]
 
 
 28
 We note, finally, that only rarely will the equities permit the application of equitable subrogation in a case governed by Sec. 4.302. The mere fact that a check is unenforceable, for example, would be insufficient to justify permitting a bank to evade its statutory accountability. We base the application of equitable subrogation in this case on the policy permeating Texas law against unjust enrichment resulting from the double discharge of a debt and on the drawee's own inability to assert its equitable defense that would extinguish the payee's claim. Absent the existence of these or other compelling equities, a drawee bank under current Texas law will not be deemed the equitable subrogee of the maker on the ground that the maker has a valid defense to the debt evidenced by the check.[14] See generally Annot., supra.VI. Conclusion.
 
 
 29
 In sum, we hold that, because the underlying debt between Heck and Starcraft has already been discharged and Heck is liable in an unappealed judgment for the amount to be paid by the Bank, the Bank, although strictly accountable under Sec. 4.302, is equitably subrogated as a matter of Texas law to the right of Heck to restitution from Starcraft. This makes Starcraft's action circuitous, which under Texas law extinguishes Starcraft's claim. We therefore reverse the judgment of the district court and remand for judgment in favor of the Bank.
 
 
 30
 REVERSED and REMANDED.
 
 TIMBERS, Senior Circuit Judge, dissenting:
 
 31
 Long experience at the bar and on the bench has taught that counsel and their clients expect--indeed are entitled--to have the claims which they address to the court ruled upon by the court. Here they will search the majority opinion in vain for such rulings. The issues upon which the majority rules were neither argued nor briefed before us. They were not raised in the district court.
 
 
 32
 The majority fashions from whole cloth an "equitable" solution to a purely statutory problem. This exercise reminds me of what John Selden said nearly three centuries ago:
 
 
 33
 "Equity is a roguish thing. For Law we have a measure, know what to trust to; Equity is according to the conscience of him that is larger or narrower, so is Equity. 'Tis all one as if they should make the standard for the measure we call a 'foot' a Chancellor's foot; what an uncertain measure would this be! One Chancellor has a long foot, another a short foot, a third an indifferent foot. 'Tis all the same thing in the Chancellor's Conscience."
 
 
 34
 Selden, Equity (1689).
 
 
 35
 Since, for reasons stated more fully below, I find no sound basis in the Uniform Commercial Code or in Texas case law for the majority's decision, I respectfully but emphatically dissent.
 
 I.
 
 36
 I have no quarrel with the majority's summary of the facts, with one notable exception. The majority omits any mention of the fact that Heck and the Johnsons are insolvent (as we were informed by counsel at oral argument). The significance of this omitted fact will become apparent in the discussion which follows in this dissenting opinion.
 
 
 37
 The Texas version of U.C.C. Sec. 4-302 imposes strict liability on the payor bank for failure to meet the midnight deadline. New Ulm State Bank v. Brown, 558 S.W.2d 20, 25-27 (Tex.Civ.App.1977). The rule of Sec. 4-302 is a simple one: If the bank misses the deadline, it must pay the face value of the check, regardless of any actual damages sustained by the payee. Goodman v. Norman Bank of Commerce, 565 P.2d 372, 374 (Okla.1977). This sometimes-harsh rule is necessary to promote efficiency and certainty in the collection process. To avoid chaos, the U.C.C. requires that the payor bank take prompt action on an instrument that is payable by it. Failure to so act imposes on the bank the risk that it will be unable to collect the amount of the check from its customer. See Met Frozen Food Corp. v. National Bank of North America, 89 Misc.2d 1033, 1038, 393 N.Y.S.2d 643, 647 (Sup.Ct., Nassau Co., 1977). It is not a "fine", as suggested by the majority, nor does it operate as one since the bank may be able to charge back against its customer.
 
 
 38
 The majority states that satisfaction of the statutorily-imposed liability discharges the "debt" represented by the check.[1] It reasons that, since Heck and Starcraft released their claims against each other, no debt existed; and Starcraft therefore would be receiving a windfall. This reasoning in my view is faulty in two respects.
 
 
 39
 First, Sec. 4-302 does not refer to, nor does it assume, the existence of a debt. Article 4 of the U.C.C. governs bank deposits and collections. It is a bank-regulatory provision. As the court held in New Ulm State Bank, the accountability of the bank does not depend upon a showing that the instrument is enforceable. 558 S.W.2d at 25. Since the two obligations are totally independent, it follows that even a check given as a gift must be paid or returned by the midnight deadline. The majority clearly is wrong when it concludes that "the drawee bank's liability must have some connection with the underlying debt."
 
 
 40
 Second, even if Sec. 4-302 required that the check have been tendered in payment of a debt, Heck's obligation to Starcraft never was satisfied. The majority confuses the concept of release with that of accord and satisfaction. A release is a surrender of a cause of action, while an accord and satisfaction is acceptance of what is intended by the parties to be full compensation of the obligation. McMillen v. Klingensmith, 467 S.W.2d 193, 195 (Tex.1971); Calamari & Perillo, Contracts 771-72 (2d ed.1977). The majority's reliance on dictum in Knutson v. Morton Foods, Inc., 603 S.W.2d 805 (Tex.1980), is misplaced. In Knutson, the Texas Supreme Court indicated that an employee-tortfeasor, who is required to indemnify an unreleased employer found liable under respondeat superior, could recover any consideration paid for the release. Id. at 807. The majority concludes that this means that the release satisfies the debt. This conclusion fails to recognize what seems to me to be the obvious: if the consideration paid for the release fully compensated plaintiff, there could be no further recourse against the employer.
 
 
 41
 Moreover, the "release" in the instant case is a contract. We must look to the intent of the parties to determine its effect. The stated impetus for Starcraft to release Heck and the Johnsons was the insolvency of those parties and not the belief that its claim was thereby satisfied. Indeed, the release specifically provided that "It is acknowledged and understood that Temple National Bank is not a party to this agreement, and this agreement shall not affect any claims asserted by or against Temple National Bank by the parties hereto." In releasing Heck and the Johnsons, Starcraft believed that it was merely saving the time, trouble and expense of litigating against parties who were judgment-proof and that its claim on the check was preserved as against the Bank. Thus, the Mutual Release was not intended by the parties to be an accord and satisfaction of the claim. It did not fully compensate Starcraft.
 
 
 42
 Since Sec. 4-302, to be operable, does not require the existence of a debt and since, even if a debt were required, Starcraft never was "compensated" for its claim, I would hold that the Bank is absolutely liable to Starcraft for the face value of the check.
 
 II.
 
 43
 The majority suggests that Heck is being required to discharge its debt to Starcraft twice as a result of the release and the judgment of the district court holding Heck liable to the Bank from which no appeal has been taken. The majority therefore concludes that Heck has a right of restitution from Starcraft to which the Bank is subrogated and which results in circuity of action. This conclusion with due respect strikes me as standing the U.C.C., and common sense, on their heads.
 
 
 44
 Clearly the Bank is not entitled to be subrogated to the claims of Heck. Unlike Sec. 4-407, which governs where a bank wrongfully pays despite a stop payment order, Sec. 4-302 does not expressly grant to the payor bank the right to be subrogated. In the Sec. 4-407 situation, furthermore, the bank by definition already has paid out on the instrument. The majority's reliance on Bryan v. Citizens National Bank, 628 S.W.2d 761 (Tex.1982) is misplaced. While Sec. 1-103 provides that general common law and equitable principles are not superceded by the Code unless contrary to its provisions, the very purpose behind Sec. 4-302--promoting certainty in the bank collection process--strongly indicates that the bank's only recourse is against its customer.
 
 
 45
 Finally, the claims that Heck had against Starcraft were unrelated to the particular transaction for which the check in question was given. The majority in effect holds that a bank is subrogated to all claims its customer may have against the payee. There would be no basis for this conclusion even under Sec. 4-407 where the right to subrogation is expressly granted.
 
 III.
 
 46
 I turn now to that portion of the judgment which rejected the Bank's claim against the Johnsons. Prior to trial the parties stipulated that in 1975 the Johnsons had signed and delivered to the Bank an agreement in which they guaranteed the debts of Heck to the Bank. By the terms of the document, the parties agreed that they had entered into a continuing guaranty. Under Texas law a continuing guaranty is defined as follows:
 
 
 47
 " 'A continuing guaranty is one which is not limited to a single transaction, but which contemplates a future course of dealing, covering a series of transactions, generally for an indefinite time or until revoked. It is prospective in its operation and is generally intended to provide security with respect to future transactions, within certain limits, and contemplates a succession of liabilities, for which, as they accrue, the guarantor becomes liable.' 38 C.J.S. Guaranty Sec. 7, p. 1142."
 
 
 48
 Blount v. Westinghouse Credit Corp., 432 S.W.2d 549, 553 (Tex.Civ.App.1968).
 
 
 49
 The duration of a continuing guaranty presents a nice question. In view of its divisible nature, a guarantor, under certain circumstances, may revoke a continuing guaranty. In the instant case, it is doubtful that the Bank's redelivery to the Johnsons of the guaranty agreement in 1979 (subsequent to payment having been stopped on the check) may be considered a revocation since by its terms the guaranty was to "remain in full force and effect until revoked in writing". Moreover, even if a continuing guaranty such as this one were revoked, the guarantor would be immune only from liability arising out of transactions between the obligor and the creditor subsequent to the revocation. Casey v. Gibson Products Co., 216 S.W.2d 266, 268 (Tex.Civ.App.1948). It is undisputed that the Bank redelivered the guaranty to the Johnsons after Heck's outstanding indebtedness to the Bank had been paid. Although neither the Bank nor Heck was aware of the Bank's statutory liability at the time of redelivery of the guaranty, the stop payment and late return of the check had taken place the previous year. In view of this chronology, the Starcraft check episode plainly was a transaction which took place prior to redelivery of the guaranty. Even if the redelivery may be viewed as a revocation of the continuing guaranty, the Johnsons nevertheless remain liable for this transaction which occurred prior to revocation.
 
 
 50
 The Johnsons argue, in the alternative, that the redelivery should be viewed as a release from liability for prior and pending transactions. The Bank argues that the Johnsons waived the affirmative defense of release. The Johnsons assert that the issue of release was tried by implied consent. It is neither necessary nor appropriate to decide this procedural matter because, even if the affirmative defense had been raised and decided, the claimed release would not be binding.
 
 
 51
 There are several problems in viewing the redelivery of the guaranty agreement to the guarantors as a release, e.g., whether the parties intended the act of redelivery to constitute a release. Assuming that all these problems were resolved in favor of the Johnsons, there remains the matter of lack of consideration. The general rule is that a release is not a valid defense by a guarantor unless the release was supported by consideration. 38 Am.Jur.2d Guaranty Sec. 80 at 1087-88 (1968). Texas courts, faced with releases in situations other than in conjunction with a guaranty, have held that a release is not binding unless supported by consideration. E.g., Southwestern Fire and Casualty Co. v. Atkins, 346 S.W.2d 892, 897 (Tex.Civ.App.1961) (due to lack of consideration, plaintiff's cashing a check offered for undisputed portion of his claim held not a release of plaintiff's claim for additional payments). In the instant case, the Johnsons' defense of release must fail because the record discloses no consideration having been given or recited for the Bank's release of the Johnsons' liability for prior transactions between the Bank and Heck covered by the guaranty agreement.
 
 
 52
 There remains to be considered whether that guaranty was broad enough to cover the indebtedness of Heck to the Bank which followed from stopping payment on the check and which resulted from the court's judgment after trial. I start by recognizing the principle that contracts of guaranty are to be construed in favor of the guarantor and may not be extended beyond their terms. McKnight v. Virginia Mirror Co., 463 S.W.2d 428, 430 (Tex.1971). The terms of the instant guaranty are plain and require no extension by us because it provides that the Johnsons
 
 
 53
 "have absolutely and unconditionally guaranteed, and do hereby absolutely and unconditionally guarantee to the said Bank, its successors and assigns, the punctual payment when due of each and every claim, demand, and cause of action of every kind, class and character of said Bank against [Heck], now existing or which may hereafter arise...."
 
 
 54
 I would hold that this broad and unambiguous language encompasses Heck's indebtedness to the Bank under the court's judgment.
 
 
 55
 I would further hold that the court erred in reciting in its judgment that the Bank presented no material evidence with respect to its claim against the Johnsons. The Bank claimed that the Johnsons were liable as guarantors, presented evidence that the Starcraft check episode occurred before the guaranty was redelivered to the Johnsons, and offered in evidence the very broad guaranty the Johnsons signed. I would also hold that the court erred in reciting in its judgment that the Bank failed to request submission of any issues to the jury on its claim against the Johnsons. The legal effect of a guaranty agreement, including the obligations of the parties, is to be decided by the court, not the jury. Maykus v. Texas Bank & Trust Co. of Dallas, 550 S.W.2d 396, 398 (Tex.Civ.App.1977).
 
 
 56
 Finally, even if the redelivery operated to relieve the Johnsons of liability for Heck transactions subsequent to the redelivery, the Johnsons remained liable for Heck indebtedness which resulted from transactions with the Bank which took place prior to the redelivery and which were covered by the guaranty--including the Starcraft check transaction. I would hold that the guaranty agreement is broad enough to cover Heck's indebtedness under the judgment of the court, which is a result of the prior transaction.
 
 
 57
 With respect to the Bank's claim against the Johnsons, I would reverse and remand the case to the district court with instructions to enter an amended judgment which will include a provision awarding to the Bank and against the Johnsons the sum of $158,392.15, together with interest according to law.
 
 IV.
 
 58
 In this relatively simple, straightforward case, the majority's reasoning is destined, I fear, to produce endless mischief in the interpretation and application of the Uniform Commercial Code.
 
 
 59
 The majority reaches the result that it does in the belief that Starcraft is reaping a windfall and that the Bank is an innocent victim. This simply is not the case. Starcraft never has been compensated for its claim against Heck. The Bank is far from a disinterested third party. It must be remembered that the funds represented by the check ultimately were applied to offset loans the Bank had made to Heck. The result of the majority opinion is to allow the Bank, in the name of "equity", to benefit, at the expense of Starcraft, from the Bank's failure to adhere to the statutory requirements.
 
 
 60
 I recognize that the majority has strained mightily to limit its decision to the peculiar facts of this case and thus to strip its decision of any precedential value.[2] Despite these valiant efforts, however, the ad hoc imposition of "equitable" principles, where statutory and contractual obligations should control, has the unfortunate effect of undermining certainty in bank collections under Article 4 of the Uniform Commercial Code.
 
 
 61
 The radiations of the majority opinion are sure to reach beyond the confines of this case--indeed beyond the boundaries of this Circuit. I wish I could believe that such radiations would be for the good.
 
 To summarize:
 
 62
 (1) I would affirm that portion of the judgment which awarded the sum of $158,392.15, plus interest, in favor of Starcraft against the Bank.
 
 
 63
 (2) I would reverse that portion of the judgment which rejected the Bank's claim against the Johnsons and remand the case to the district court with instructions to proceed as stated above.[3]
 
 
 64
 From the majority's refusal to do so, I respectfully but emphatically dissent.
 
 
 
 *
 Senior Circuit Judge of the Second Circuit, sitting by designation
 
 
 [1]
 The Mutual Release provided in pertinent part:
 This Mutual Release and Settlement Agreement, by and between Starcraft Company, a division of Bangor Punta Corporation, and C.J. Heck Company of Texas, Inc., Robert A. Johnson and Carol H. Johnson, provides as follows:
 ... The parties to this agreement have agreed to compromise and settle all claims as between them, the condition of such settlement being that Starcraft Company releases and waives all claims it may have or could assert against C.J. Heck Company of Texas, Inc., Robert A. Johnson and Carol H. Johnson; and C.J. Heck Company of Texas, Inc., Robert A. Johnson and Carol H. Johnson release and waive all claims they may have or could assert against Starcraft Company. Accordingly, in consideration of the mutual covenants set forth herein, the parties hereby mutually release, discharge and acquit one another of any and all claims, demands and causes of action, whether or not asserted in the above-referenced litigation, and whether known or unknown. The parties shall pay their own costs of court. It is acknowledged and understood that Temple National Bank is not a party to this agreement, and this agreement shall not affect any claims asserted by or against Temple National Bank by the parties hereto.
 
 
 [2]
 The court did receive in evidence the stipulation which notified the court of the Mutual Release. The stipulation did not contain information regarding the value of the claims
 
 
 [3]
 In this opinion we use the term "special interrogatories" as provided for in Fed.R.Civ.P. 49, although the term "special issues" appears in the instant record
 
 
 [4]
 It is undisputed that Sec. 4.302(1) applies in this case. Heck's check is clearly a "demand item other than a documentary draft," see Tex.Bus. & Com.Code Ann. Sec. 4.104, and the Bank is a "payor bank" under the section. Tex.Bus. & Com.Code Ann. Sec. 4.105
 
 
 [5]
 We therefore agree with the dissent that "Sec. 4-302 does not refer to, nor does it assume, the existence of a debt." By violating the statutory provision, a bank becomes primarily liable for the full amount of the check, regardless of the obligatory nature of the maker's attempted transfer to the payee. We merely hold here that this liability is not in all regards independent of the debt, should one exist. Rather, an ancillary consequence of satisfying Sec. 4.302 liability in such a context is the payment of the debt. If this were not so, the bank would have no right of charge back against the payee
 
 
 [6]
 Starcraft, joined by the dissent, asserts on appeal that the Mutual Release constituted only a release and not an accord and satisfaction. Starcraft points out that Texas courts hold that a release is simply the surrender of a claim against an individual defendant, while an accord and satisfaction constitutes full compensation for the injuries. See Duncan v. Cessna Aircraft Co., 665 S.W.2d 414, 422 (Tex.1984); Rexroat v. Prescott, 570 S.W.2d 457, 459 (Tex.Civ.App.1978, writ ref'd n.r.e.). Thus, Starcraft and the dissent argue, the Mutual Release did not have the effect of paying Starcraft the money owed and does not protect Heck from the Bank's claim for charge back. See Knutson v. Morton Foods, Inc., 603 S.W.2d 805 (Tex.1980). We reject this argument for two reasons. First, in Knutson, the Texas Supreme Court, in holding that the release of an employee does not bar an action against the employer on the ground of respondeat superior, suggested that, if the employer subsequently obtained indemnification from the employee, the employee would be entitled to recover the money it paid to the claimant in consideration for the release. Id. at 807. The ability of the employee to receive restitution indicates that a release has a direct effect on the debt underlying the claim, at least in regard to that tortfeasor. If a release were completely separate from the underlying debt, the consideration paid for the release could not go to compensate the claimant for his substantive claims. The employee, once having indemnified the employer, would have no recourse against the claimant in unjust enrichment since the claimant would have been paid once for the release and once for his claim, with no overlap between the two
 Second, the distinction drawn by Starcraft between a release and an accord and satisfaction simply is not pertinent to the instant case dealing with liability under Sec. 4.302. We do not hold here that the Mutual Release extinguished Starcraft's claim against the Bank under Sec. 4.302. We merely hold that the Mutual Release ended Starcraft's claim against Heck. As noted above, the Bank's liability under Sec. 4.302 in no way is dependent upon or derived from the enforceability of the underlying instrument; rather, it is premised on the violation of the statute. See New Ulm State Bank, supra. Thus, the termination of the claim, whether by release or an accord and satisfaction, has absolutely no effect on the narrow issue of the Bank's accountability under Sec. 4.302. It does, however, serve as the basis of a claim for restitution since, by being obligated to indemnify the Bank for its payment to Starcraft, Heck is indirectly being required to satisfy a debt that has already been released.
 
 
 [7]
 Heck's claim for restitution against Starcraft would not be subject to the Mutual Release since the claim would have accrued after the parties entered into the release. Although the release discharged all claims whether known or unknown, it did not purport to release claims that might arise in the future. See supra note 1
 
 
 [8]
 The dissent argues that Starcraft entered into the Mutual Release merely to save "the time, trouble and expense of litigating against parties who were judgment proof" and never did recover any payment for the debt itself. We addressed this argument supra note 6. We pause here merely to note that Starcraft could have saved itself "the time, trouble and expense of litigating" against Heck and the Johnsons by simply not suing them. The dissent's characterization of the contract ignores both that the Bank's liability was primary and the mutuality of the release
 
 
 [9]
 Tex.Bus. & Com.Code Ann. [U.C.C.] Sec. 4.407 provides:
 If a payor bank has paid an item over the stop payment order of the drawer or maker or otherwise under circumstances giving a basis for objection by the drawer or maker, to prevent unjust enrichment and only to the extent necessary to prevent loss to the bank by reason of its payment of the item, the payor bank shall be subrogated to the rights
 (1) of any holder in due course on the item against the drawer or maker; and
 (2) of the payee or any other holder of the item against the drawer or maker either on the item or under the transaction out of which the item arose; and
 (3) of the drawer or maker against the payee or any other holder of the item with respect to the transaction out of which the item arose.
 
 
 [10]
 Tex.Bus. & Com.Code Ann. [U.C.C.] Sec. 1.103 provides:
 Unless displaced by the particular provisions of this title, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.
 
 
 [11]
 Although the Bank erroneously described the relationship between itself and Heck as being one of surety and principal and not one of subrogation, the Bank asserted that the discharge of Heck's liability entitled the Bank to rely on Heck's equities and defenses. According to Federal Rule of Civil Procedure 8(f), "[a]ll pleadings shall be so construed to do substantial justice." See Allied Chem. Corp. v. Mackay, 695 F.2d 854, 856 (5th Cir.1983) (explicitly construing rules "to do substantial justice"). The Bank was not required to state certain magic words in order to assert a successful defense. The Bank was only required to give Starcraft fair notice of the nature of its assertions. C. Wright & A. Miller, Federal Practice and Procedure: Civil Sec. 1274. We hold that the Bank met this requirement here
 We recognize moreover that the defense of circuitous action is an affirmative defense since by asserting it a defendant must assume his own liability and rely on new matters to extinguish the plaintiff's claim. See Maryland Cas. Co. v. Employers Mut. Liability Ins. Co., 208 F.2d 731 (2d Cir.1953) (characterizing the defense of circuitous action as an affirmative defense); J. Moore, Moore's Federal Practice Sec. 8.27. Failure to assert an affirmative defense in a responsive pleading usually results in a waiver. See Funding Sys. Leasing Corp. v. Pugh, 530 F.2d 91, 95 (5th Cir.1976); C. Wright & A. Miller, Federal Practice and Procedure: Civil Sec. 1278. We have held, however, that "[w]here the matter is raised in the trial court in a manner that does not result in unfair surprise ... technical failure to comply precisely with Rule 8(c) is not fatal." Allied Chem. Corp. v. Mackay, supra, at 856. In the instant case, the defense did not accrue until after the responsive pleadings were filed. The Bank's assertion of the defense in a trial motion and memorandum instead of in an amended pleading did not prejudice Starcraft in its ability to respond. Thus, because Starcraft was not unfairly surprised by the manner in which the Bank asserted the defense, we hold it was not waived.
 
 
 [12]
 Although Sec. 4.302 does not expressly grant a right of subrogation in the drawee bank, we think such a right is available through Sec. 1.103, which provides that principles of law and equity supplement the provisions of the Code. See supra note 4. The dissent argues that the application of equitable principles to this particular case is contrary to "the very purpose behind Sec. 4-302--promoting certainty in the bank collection process." We disagree. As discussed below, the instances in which the factual circumstances would warrant the application of the principles applied in this opinion would be few. The certainty necessary for the smooth operation of the bank collection process, therefore, is not compromised in any significant way by our holding in this case. Moreover, the possibility--we think slight--that the reasoning used herein will be misused in the future does not seem to us to be a sufficient justification for not arriving at a just and equitable solution in the case at hand. The inclusion of Sec. 1.103 in the Texas Commercial Code reflects an explicit legislative judgment that statutory obligations should not control to the exclusion of traditional principles of equity when the application of those principles would not undermine the purpose of relevant statutory provisions but would result in justice between the parties
 
 
 [13]
 Contrary to the contentions of the dissent, we do not hold that a bank under these circumstances is subrogated to all claims the maker may have against the payee. The Bank here is subrogated only to Heck's right of restitution arising from its obligation to indemnify the Bank for its payment of Heck's debt, which has already been the subject of an executed release
 
 
 [14]
 For instance, the equities in the instant case are simply not present in New Ulm State Bank, supra, in which the Texas court held that under Sec. 4.302 a payor bank's liability was not dependent upon a showing that the instrument was enforceable. New Ulm State Bank did not deal with a debt that had already been satisfied and that would have been paid a second time if the payee recovered. Nor did New Ulm State Bank involve a drawer who was insolvent and effectively out of business. Rather, in New Ulm State Bank, the bank refused to honor the check because there were insufficient funds in the drawer's account. The evidence in that case in addition showed that the bank actively tried to protect the drawer of the check against the drawee. New Ulm State Bank, supra, at 23. The drawer of the check, finally, had no equitable claim against the drawee for unjust enrichment and no defense of circuitous action
 Since we find that Starcraft's claim against the Bank is extinguished, we do not reach the issue of the Bank's right to recover from the Johnsons the amount paid to Starcraft.
 
 
 [1]
 The Bank argues somewhat differently that the mutual release entered into by Heck and the Johnsons with Starcraft was an accord and satisfaction; and that the Bank, as "surety", with Heck as principal, therefore is released from paying the obligation represented by the check. This is but one example of a claim urged by one of the parties and never ruled upon by the majority. Rather, the majority chooses to reverse on grounds not urged by the parties before us or before the district court. This strikes me as eminently unfair to the district court, as well as to the parties and their counsel
 
 
 [2]
 I note, however, that the author of the majority opinion has designated it for publication
 
 
 [3]
 I note again that no appeal has been taken from that portion of the judgment which awarded to the Bank, pursuant to its right of charge back against its customer Heck, a sum in the same amount as was awarded in favor of Starcraft against the Bank